DECISION AND JUDGMENT ENTRY
{¶ 1} John Simmons appeals the judgment of the Highland County Court of Common Pleas overruling his motion to suppress evidence. Simmons contends that the trial court erred in finding that: (1) he and/or his wife gave voluntary consent for the Highland County Sheriff's Deputies to search the contents of the locked safe in their bedroom; (2) exigent circumstances existed to justify a warrantless search of the safe; and (3) the consent to search that he and his wife gave after the search and seizure of the contents of their bedroom safe was voluntary. Because we find that the record contains no competent, credible evidence to support the trial court's conclusion that any consent given by either Mr. or Mrs. Simmons for the Deputies to enter the premises included consent for the Deputies to search the locked safe in their bedroom, we sustain Mr. Simmons' first assignment of error. Because we find that a prudent and reasonable officer would not have concluded that a warrantless search was necessary to protect the lives of law enforcement officers and other innocent persons, we conclude that no exigent circumstance existed to justify the warrantless search. Therefore, we sustain Mr. Simmons' second assignment of error. Because the trial court did not consider the impact of the illegal search, or Mr. Simmons' subsequent detention, upon his later consent to search, it would be improper for this reviewing court to usurp the trial court's role and proceed on the merits of this question. Therefore, we overrule Mr. Simmons third assignment of error. Accordingly, we affirm the trial court's judgment in part, reverse it in part, and remand this cause for further proceedings consistent with this opinion.
 I. {¶ 2} On November 30, 2003, near dusk, Simmons and his wife arrived at their home and discovered a burglary in progress. The burglar took off, and Simmons gave chase through a field, into a nearby church, down the aisle, past the congregation and the pulpit, and out the side door. Simmons subdued the suspect in the church parking lot, and Highland County Sheriff's Deputies Malone and Miller arrived on the scene, having been summoned by a member of the congregation. Shortly thereafter, Detective Croy arrived as well.
 {¶ 3} Outside the church, Mr. Simmons and some of his friends and/or family members picked up coins that spilled from a piggy bank stolen from his residence. They placed the coins in evidence bags provided by Det. Croy. Det. Croy and the Deputies learned that a neighbor discovered two guns lying a few feet from the back door of the Simmons residence. The neighbor gave the guns to Mrs. Simmons, who then placed them on the bed in the Simmons' bedroom.
 {¶ 4} Upon learning that the guns were found outside the residence, Det. Croy asked Mr. Simmons whether he owned any other weapons. Mr. Simmons indicated that he owned two pistols, a .45 caliber and a .25 caliber. Because he had not yet been inside his home, Mr. Simmons did not know if either of those guns was missing.
 {¶ 5} At the house, Deputies Malone and Miller spoke briefly with Mrs. Simmons and learned that the back door was the likely point of entry. The asked Mrs. Simmons where the guns were. She indicated that they were in the bedroom. The parties do not dispute that the Deputies then entered the residence and proceeded to the bedroom. However, there was conflicting testimony as to whether Mrs. Simmons either expressly or impliedly consented to their entry to process the crime scene. While the detectives were in the residence, they asked Mrs. Simmons if she thought anything else might be missing, and she replied that there might be a missing handgun.
 {¶ 6} Given that both Mr. and Mrs. Simmons had indicated that another weapon could be missing, Det. Croy and the Deputies shifted the focus of their investigation in an effort to locate that weapon, a .45 caliber pistol. Before they returned to the Simmons residence, Mr. Simmons informed Det. Croy that he remembered that, the last time he used the gun, he cleaned it and put it in the top of his gun safe. Therefore, Mr. Simmons suggested that they call off the search. However, fearing the possibility that an innocent bystander could find the weapon in the field, or that an accomplice, who was known to have left the scene in an automobile, could have the weapon in his possession, Det. Croy insisted that they locate the weapon. He asked Mr. Simmons to return to the house and open the gun safe to make certain that the gun was there.
 {¶ 7} At the residence, Mr. and Mrs. Simmons engaged in a discussion regarding the location of the key to the gun safe, with both of them denying knowledge of the key's whereabouts. During the Simmons' exchange, Deputies Malone and Miller were in the bedroom and could hear every word. Deputy Malone observed a key lying on top of a dresser next to the bed. He recognized the shape of the key as a gun safe key, and announced, "I've got it." Upon hearing Deputy Malone's exclamation, Mr. and Mrs. Simmons and Det. Croy headed toward the bedroom. Upon reaching the bedroom door, they observed Deputy Malone, who had just opened the door of the gun safe. They heard Deputy Malone say, "It looks like more than two people are going to jail tonight." Then, they watched him remove two bags of marijuana from the open safe.
 {¶ 8} After discovering the marijuana, someone from the Highland County Sheriff's department transported Mr. and Mrs. Simmons to the Highland County Justice Center. There, after discussing the available options, Mr. and Mrs. Simmons executed a consent to search form. During the search that followed, the Deputies discovered additional drugs and evidence of drug trafficking. The Highland County Grand Jury later returned an indictment, charging Mr. Simmons with: (1) trafficking in marijuana in violation of R.C. 2925.03(A)(2), a third degree felony; (2) possession of marijuana in violation of R.C. 2925.11, a third degree felony; and (3) possession of criminal tools in violation of R.C. 2923.24, a fifth degree felony.
 {¶ 9} Mr. Simmons entered a plea of not guilty and moved the court to suppress evidence obtained from his residence on November 30, 2003, and any statements made by either Mr. or Mrs. Simmons. The trial court conducted a hearing upon Mr. Simmons' motion. In its decision, the trial court found that, under the facts and circumstances of this case, Mr. Simmons had no reasonable expectation of privacy in his home, and, therefore, no search occurred within the meaning of the Fourth Amendment. Thus, the court overruled Mr. Simmons' motion to suppress. Recognizing that its analysis was subject to dispute, the court went on to analyze the case as if the Fourth Amendment did apply. Whereupon, the court concluded that the search of the gun safe fell within two exceptions to the Fourth Amendment requirement for a search warrant. Specifically, the court found that the search was not unreasonable because: (1) the Deputies were lawfully present at their vantage point and observed obvious, incriminating evidence in plain view; and (2) the risk that the .45 caliber weapon could injure innocent persons or law enforcement officers who might encounter the accomplice, who had left the scene via automobile, constituted an exigent circumstance justifying the warrantless intrusion. Additionally, the court concluded that Mr. Simmons voluntarily consented to the subsequent search of his residence.
 {¶ 10} Mr. Simmons and the state ultimately reached a plea agreement, wherein he agreed to plead no contest to possession of marijuana and the state agreed to dismiss the remaining charges. After accepting his plea, the trial court sentenced Mr. Simmons to three years of community control, a $5,000 fine, 100 hours of community service, and a six-month driver's license suspension.
 {¶ 11} Mr. Simmons timely appeals, raising the following assignments of error: "(1) The trial court erred to the prejudice of [Mr. Simmons] in concluding that the [Mr. Simmons] and/or his wife gave voluntary consent to the search of the contents of the locked safe located in their bedroom. (2) The trial court erred to the prejudice of [Mr. Simmons] in concluding that exigent circumstances existed sufficient to avoid the warrant requirement of the Fourth Amendment of the United States Constitution. (3) The trial court erred in finding that the consent to search their home obtained subsequent to the search and seizure of the contents of their bedroom safe was voluntary."
 II. {¶ 12} The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The primary purpose of the Fourth Amendment is to protect the sanctity of the home from unreasonable governmental intrusion. Payton v. NewYork (1980), 445 U.S. 573, 585 (quotations and citations omitted).
 {¶ 13} Under the Fourth Amendment, a search or seizure conducted without a prior finding of probable cause by a judge or magistrate is per se unreasonable, subject to a few specific and well-delineated exceptions. California v. Acevedo (1991),500 U.S. 565; State v. Kessler (1978), 53 Ohio St.2d 204, 207. The prosecution has the burden of establishing the application of one of the exceptions to this rule designating warrantless searches as per se unreasonable. Id. (citations omitted). A court must exclude any evidence obtained in violation of the accused'sFourth Amendment rights. Mapp v. Ohio (1961), 367 U.S. 643,655. The purpose of this exclusionary rule is to remove any incentive to violate the Fourth Amendment and, thereby, deter police from unlawful conduct. State v. Jones (2000),88 Ohio St.3d 430, 435.
 {¶ 14} Our review of a decision on a motion to suppress presents mixed questions of law and fact. State v. Hatfield
(Mar. 11, 1999), Ross App. No. 98CA2426, citing State v.McNamara (Dec. 23, 1997), Athens App. No. 97 CA 16, citingUnited States v. Martinez (C.A. 11, 1992), 949 F.2d 1117, 1119. At a suppression hearing, the trial court is in the best position to evaluate witness credibility. State v. Dunlap (1995),73 Ohio St.3d 308, 314. Accordingly, we must uphold the trial court's findings of fact if the record supports them by competent, credible evidence. Id. We then conduct a de novo review of the trial court's application of the law to the facts.State v. Anderson (1995), 100 Ohio App.3d 688, 691.
 {¶ 15} In his first assignment of error, Mr. Simmons contends that the trial court erred in finding that he and/or his wife voluntarily consented to the search of the locked gun safe in their bedroom. A search pursuant to an individual's voluntary consent is a specifically established and well-delineated exception to the Fourth Amendment warrant requirement.Schneckloth v. Bustamonte (1973), 412 U.S. 218, 219. Whether an individual voluntarily consented to a search constitutes a question of fact, not a question of law. See Id. at 227; Ohio v.Robinette (1996), 519 U.S. 33, 40; State v. Robinette (1997),80 Ohio St.3d 234, 248-249 (Cook, J., concurring in judgment only); see, also, State v. Fry, Jackson App. No. 03CA26,2004-Ohio-5747, at ¶ 21; State v. Southern (Dec. 28, 2000), Ross App. No. 00CA2541. The prosecution bears the burden of proving by clear and positive evidence that consent was voluntarily given. Schneckloth, 412 U.S. at 222; Bumper v.North Carolina (1968), 391 U.S. 543, 548. The Sixth Circuit Court of Appeals has further held that only consent that is "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion" will suffice. UnitedStates v. Worley (C.A. 6, 1999), 193 F.3d 380, 386, quotingUnited States v. Tillman (C.A. 6, 1992), 963 F.2d 137, 143.
 {¶ 16} Courts have interpreted the phrase "clear and positive evidence" to be the equivalent of proof by clear and convincing evidence. State v. Danby (1983), 11 Ohio App.3d 38, 41; Statev. Ingram (1992), 82 Ohio App.3d 341, 346. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." Cross v. Ledford (1954), 161 Ohio St. 469,477. We consider the totality of the circumstances when determining whether clear and convincing evidence exists.Schneckloth, 412 U.S. at 222.
 {¶ 17} Where the standard of proof is clear and convincing evidence, we examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy that degree of proof. State v. Schiebel (1990), 55 Ohio St.3d 71, 74 (citation omitted). As long as there is some competent, credible evidence supporting all the essential elements of the case, we will not reverse the trial court's judgment. Id. We will not substitute our judgment for that of the trial court when competent and credible evidence exists to support the trial court's findings of fact and conclusions of law. Id. at 74-75, citing Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80; C.E. Morris Co.v. Foley Constr. Co. (1978), 54 Ohio St.2d 279.
 {¶ 18} Initially, we note that the trial court did not explicitly find that Mr. and/or Mrs. Simmons consented to the search of the locked gun safe. Instead, the trial court found that Mr. and/or Mrs. Simmons consented to the Deputies' entry into their home. Then, because the trial court found that Mr. Simmons willingly accepted the Deputies' help to locate his missing gun collection, worked shoulder to shoulder with them in their investigation, and voluntarily consented to their entry into his home, the trial court found that Mr. Simmons had no reasonable expectation of privacy in his own home. Therefore, the court concluded that Deputy Malone's opening of the locked gun safe did not constitute a "search" within the meaning of theFourth Amendment.
 {¶ 19} However, our review of the record reveals that there is no evidence to support a number of the trial court's findings. Specifically, we note that the record plainly reveals that Mr. Simmons only owned four guns, and that no one testified regarding the value of the guns. Therefore, the record does not support the trial court's finding that Mr. Simmons owned a "substantial collection of valuable guns," or that "more and more weapons were recovered" because of the Deputies' investigation. The testimony of Mr. and Mrs. Simmons, as well as that of the Deputies, reveals that, other than the gun discovered in the locked gun safe, the only two guns recovered were not recovered by law enforcement officers at all. The record clearly and undisputedly demonstrates that a neighbor recovered the two guns and returned them to the house, where Mrs. Simmons took them to the bedroom and placed them on the bed.
 {¶ 20} In determining whether or not Mr. Simmons enjoyed an expectation of privacy with regard to his locked gun safe, located in the bedroom of his residence, the trial court offered the following analogy:
1. A breaking and Entering occurs and the defendant is the victim.
2. Law enforcement officers arrive and the officers and the defendant jointly search for missing firearms.
3. All guns except one are found.
4. The defendant describes the sole missing gun as a Remington shot gun.
5. The search area includes an area covered with tall grass and weeds.
6. A solitary Deputy sees in the weeds a leather gun case suitable for a shot-gun with the defendant's name inscribed on the gun case.
7. The Deputy picks up the gun case and notes that it contains something of weight inside.
8. The Deputy yells to the defendant who is approximately 20 feet away "I've got it".
9. The defendant is silent but walks over to the Deputy.
10. While the defendant is walking toward the Deputy the Deputy unzips the gun case and finds:
a. The missing shot-gun which is legal in all respects and nothing else;
Or
b. The missing shot-gun which has been altered to an illegal "sawed-off" shot-gun;
Or
c. The legal missing shot-gun and open and obvious contraband.
 {¶ 21} Thereafter, the trial court concluded that the defendant would not have a reasonable expectation of privacy under any of those scenarios. Similarly, the trial court concluded that Mr. Simmons had no expectation of privacy under the "very narrow circumstances" of this case.
 {¶ 22} However, the trial court's analogy is readily distinguishable from the facts at hand for two reasons. First, in the court's example, the search occurs outdoors, where a defendant would presumably have a lesser expectation of privacy than he would enjoy within the confines of his own home. See, e.g. Oliver v. United States (1984), 466 U.S. 170 (holding thatFourth Amendment protection does not extend to open fields). Second, because the shotgun in the court's example is found outside, rather than in its usual resting place in the defendant's home, it actually constitutes some evidence of the crime actually being investigated (i.e. it is stolen property being recovered during the course of a law enforcement investigation).
 {¶ 23} In contrast, the search conducted by the Deputies in this case occurred within the confines of the Simmons' home — where, under the Fourth Amendment, Mr. Simmons enjoyed a heightened expectation of privacy. Furthermore, it involved the search for an item of property with the sole purpose of establishing that it was not evidence of a crime (i.e. if it was found in its usual resting place, it was not stolen in the burglary). Accordingly, we find the trial court's analogy inapposite.
 {¶ 24} Next, we address the trial court's finding that "Deputies Malone and Miller with the full knowledge and consent of [Mr. Simmons] and[/]or [Mrs. Simmons] placed the guns inside the * * * mobile home in a rear bedroom on [the Simmons'] bed and began to catalog and photograph each weapon." Mr. Simmons contends that neither he nor his wife gave either of the Deputies express permission to enter the residence. He also argues that even if they had permission to enter the residence, that permission to enter did not constitute consent for the Deputies to search his home. Our review of the record reveals conflicting testimony about how the Deputies came to enter the Simmons residence.
 {¶ 25} Mrs. Simmons testified that, when the Deputies came to the door and asked her where the guns were located, she took a few steps from the back door and pointed to the bedroom door. Then, she stated that the Deputies entered the house through the open back door and proceeded to the bedroom. Deputy Malone testified that Mrs. Simmons invited him into the residence after pointing to the bedroom to indicate where the guns were located.
 {¶ 26} Deputy Malone also testified that after viewing the guns on the bed, he asked Mrs. Simmons if she thought anything else might be missing. When she indicated that there might be a handgun missing, he and Deputy Miller left the residence and began to search for the gun. When they reached the church, he stated that Det. Croy instructed them to go back to the residence to begin taking photographs and processing the crime scene.
 {¶ 27} Deputy Malone's testimony reflects that when he and Deputy Miller reached the residence, the back door was locked. He walked around the side of the house toward the front and discovered Mrs. Simmons was in her car preparing to leave. He stated that he asked her to let him and Deputy Miller back into the residence so that they could begin processing the crime scene, and she stated she would. He indicated that she then entered the front door of the residence while he walked around to the back door, where she let him and Deputy Miller enter. Hence, the record contains some competent, credible evidence that Mrs. Simmons consented to the Deputies' entrance into the home to "process" the crime scene.[1]
 {¶ 28} As Mr. Simmons notes in his brief, the Ohio Supreme Court has previously held that "[a] person who admits a police officer to his premises in compliance with the officer's request for an interview does not thereby waive his constitutional immunity from unreasonable searches, nor does he thereby consent to a search of the premises." City of Lakewood v. Smith (1965),1 Ohio St.2d 128, at paragraph one of the syllabus. See, also,United States v. Ivy (C.A. 6, 1998), 165 F.3d 397, 401-04 (examining whether consent to entry was given before determining whether consent to search was given and voluntary). Thus, consent to enter the premises does not necessarily include consent tosearch the premises. We acknowledge that the processing of a burglary scene is inherently more invasive than an interview with a law enforcement officer. However, we believe that consent to process a burglary crime scene does not necessarily include consent to an unfettered search of the premises. Whether authorized by warrant or by consent, the scope of a search is limited by the terms of its authorization. State v. Riggins,
Hamilton App. No. C-030626, 2004-Ohio-4247, at ¶ 28, citingWalter v. United States (1980), 447 U.S. 649, 656; see, also,State v. Robinson (1995), 103 Ohio App.3d 490, 495. Therefore, we must consider whether the scope of Mrs. Simmons' consent was broad enough to encompass Deputy Malone's actions in opening the locked gun safe.
 {¶ 29} The United States Supreme Court has recognized that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v.Jimeno (1991), 500 U.S. 248, 251, citing Illinois v. Rodriguez
(1990), 497 U.S. 177, 183-189; Florida v. Royer (1983),460 U.S. 491, 501-502 (opinion of White, J.); Id., at 514 (Blackmun, J., dissenting). The Court has further noted that "[t]he scope of a search is generally defined by its expressed object." Id., citing United States v. Ross (1982), 456 U.S. 798.
 {¶ 30} The state contends that, pursuant to the holding inState v. Stuckey, Seneca App. Nos. 13-03-08 and 13-03-09, 2003-Ohio-3177, Deputy Malone's opening of the locked safe was within the scope of the consent given by Mr. and/or Mrs. Simmons to process the crime scene. In Stuckey, the defendant filed a police report stating that his home had been burglarized. The police arrived to investigate the burglary, and the defendant walked the officers through the home, pointing out items that were disturbed in several rooms, including a bathroom. While dusting various items for fingerprints, an officer opened the top drawer of a dresser in the bathroom and discovered rolling papers, a pipe, and other items of drug paraphernalia. The officer seized the items and cited the defendant for knowingly obtaining, possessing or using a controlled substance. The defendant filed a motion to suppress the evidence confiscated from his home, which the trial court denied.
 {¶ 31} On appeal, the Stuckey court found that, at the suppression hearing, the officers testified that the defendant directed them to the bathroom to investigate a disturbance with some open suitcases. Stuckey at ¶ 8. One officer testified that the intruder probably leaned on the dresser, and that he had to open the top drawer of the dresser to effectively lift any fingerprints from the dresser. Id. Accordingly, the Third District Court of Appeals found that there was some competent, credible evidence that opening the drawer of the dresser in order to lift fingerprints was within the scope of the defendant's consent for the police to investigate the burglary. Id. In finding that the defendant did not revoke his consent, the court noted that, even after the discovery of the drug paraphernalia, the defendant allowed the investigation to continue. Id.
 {¶ 32} The facts before us are readily distinguishable from those in Stuckey. Here, Mrs. Simmons granted Deputies Malone and Miller consent to enter the premises to "process" the crime scene. Deputy Miller testified that the purpose of going to the bedroom was "to photograph the weapons, take serial numbers and that sort of thing." Furthermore, Deputy Malone testified that he did not ask for consent to search the home, and both he and Deputy Miller testified that Mr. and Mrs. Simmons did not give them consent to search the home.
 {¶ 33} On cross-examination, Deputy Malone, Deputy Miller, and Det. Croy testified that the gun safe was locked and displayed no visible signs of forced entry. Det. Croy and Deputy Miller further indicated that because there was no sign that the safe had been tampered with, it was not part of the crime scene under investigation. Moreover, Det. Croy testified that once Deputy Malone opened the safe, Mr. and Mrs. Simmons immediately protested by stating that they did not give their permission for the safe to be opened.
 {¶ 34} We find that the record contains no competent, credible evidence to support the trial court's conclusion that any consent given by either Mr. or Mrs. Simmons for the Deputies to enter the premises for the purpose of processing the burglary crime scene included consent for the Deputies to search the locked safe in their bedroom. Although the safe was present in the bedroom where items were removed during the burglary, the testimony of the law enforcement officers investigating the crime revealed that, because the safe was locked and displayed no evidence of tampering, the safe was not part of the crime scene under investigation. We conclude that a typical reasonable person would not have understood the exchanges between Mr. and Mrs. Simmons and the law enforcement officers to grant consent to open the locked safe that clearly, and by law enforcement's own admission, had not been disturbed during the crime being investigated.
 {¶ 35} The trial court makes much of the fact that Mr. Simmons was a "victim" at the outset of this investigation, rather than a "suspect." However, instead of using that distinction to protect Mr. Simmons from further, unwarranted intrusion after his home had been burglarized, the court used it to strip him of his Fourth Amendment right to privacy in his own home. Thus, the trial court appears to conclude that an individual suspected of committing a crime has a greater expectation of privacy than the victim of his crime does. We simply cannot support the trial court's holding that, by becoming the victim of a crime and permitting law enforcement to process the crime scene, an individual loses all right and expectation of privacy in the sanctity of his own home. Accordingly, we sustain Mr. Simmons' first assignment of error.
 III. {¶ 36} In his second assignment of error, Mr. Simmons contends that the trial court erred in finding that exigent circumstances existed to justify the Deputy's search of his locked gun safe without a warrant. Specifically, Mr. Simmons challenges the trial court's conclusion that the possibility that the suspected accomplice might have obtained a handgun from the Simmons residence constituted a "need to know" exigency. In support of his argument, Mr. Simmons notes that, at the time the officers unlocked the safe, there was no evidence that the accomplice ever entered the Simmons residence or had any contact with the suspect after the suspect entered the residence. Mr. Simmons also notes that, in Flippo v. West Virginia (1999),528 U.S. 11, the United States Supreme Court refused to establish a general crime scene exception to the Fourth Amendment warrant requirement.
 {¶ 37} The exigent circumstances exception to theFourth Amendment warrant requirement recognizes that the exigencies of a given situation may make the needs of law enforcement so compelling that a warrantless search is objectively reasonable.State v. Howard (1991), 75 Ohio App.3d 760, 766, citingMcDonald v. United States (1948), 335 U.S. 451; Chimel v.California (1969), 395 U.S. 752; Warden v. Hayden (1967),387 U.S. 294; Schmerber v. California (1966), 384 U.S. 757. The United States Supreme Court has only recognized a few emergency conditions that satisfy the requirement. Id. at 774. See e.g.,United States v. Santana (1976), 427 U.S. 38 (hot pursuit of a fleeing felon); Schmerber (imminent destruction of evidence);Michigan v. Tyler (1978), 436 U.S. 499 (investigating cause of ongoing fire). See, also, Mincey v. Arizona (1978),437 U.S. 385, 392 (need to protect or preserve life or avoid serious injury), accord State v. Applegate (1994), 68 Ohio St.3d 348,350; Minnesota v. Olson (1990), 495 U.S. 91 (risk of danger to police or others). The Court has also specifically rejected a general "murder scene" exception to the warrant requirement. See,Mincey, supra, at 395; Thompson v. Louisiana (1984),469 U.S. 17, 21; Flippo v. West Virginia (1999), 528 U.S. 11, 14.
 {¶ 38} The determination of whether an exigency exists sufficient to justify a warrantless entry or search must occur on a case-by-case basis. Mincey, 437 U.S. at 392-393. Furthermore, the scope of the exigent circumstances exception "must be strictly circumscribed by the exigencies that justify the entry, and `the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.'" State v. Sheppard (2001),144 Ohio App.3d 135, 140-141, quoting Welsh v. Wisconsin (1984),466 U.S. 740, 749-750; Blanchester v. Hester (1992),81 Ohio App.3d 815, 818.
 {¶ 39} We have previously found that, in determining whether the totality of the facts and circumstances known to an officer give rise to a reasonable belief that immediate entry is necessary, we must apply an objective standard. State v.Letsche, Ross App. 02CA2693, 2003-Ohio-6942, at ¶ 29, citing LaFave, Search and Seizure, Section 6.6(a); Root v. Gauper
(C.A.8, 1971), 438 F.2d 361. Thus, we must determine whether a prudent and reasonable officer would see a need to act. Id., citing Wayne v. United States (C.A.D.C., 1963), 318 F.2d 205.
 {¶ 40} Here, in support of its conclusion that exigent circumstances existed, the trial court found, in pertinent part: "A loaded 45 caliber handgun is without question a dangerous weapon that can inflict serious bodily injury and death at every pull of the trigger. Here, the Deputies had an obligation to protect or preserve life and avoid serious injury. State v.Arbino [(1996), 83 Ohio Misc.2d 12]. It was of extreme importance that this gun be found to protect the lives of innocent persons including any law enforcement officers that might encounter the accomplice who had left the scene via automobile. Taking the time to prepare an affidavit and search warrant would result in a considerable length of time during which the public at large and other law enforcement officers would be unjustifiably endangered." Even if we accept the trial court's findings of fact as true, we cannot agree with the trial court's conclusion that exigent circumstances existed to justify Deputy Malone's actions in opening and searching the contents of Mr. Simmons' gun safe.
 {¶ 41} The Sixth Circuit Court of Appeals has previously held that exigent circumstances justified a warrantless police entry into a residence to retrieve a shotgun. United States v.Johnson (Aug. 5, 2004), C.A. 6 (Mich.) No. 03-1301, 106 Fed. Appx. 363, unreported. There, officers were responding to a report of a man firing a shotgun in the air in a residential neighborhood. Upon their arrival, they witnessed the man fire two shots in the air and reload the gun. They heard someone say "police" and the man fled into the house. The officers knocked on the door and shouted to the occupants, but all they heard were muffled voices and rustling noises from within. Because the officers did not know the number of occupants, whether there were children in the home, whether the occupants had been taken hostage, the identity of the shooter, or whether the shooter resided there, the police forced open the front door and entered the residence. The officers secured a man, later determined to be the shooter, and a woman, and began to search for the armed man and any other occupants. During the course of that search, they discovered a loaded shotgun in a pantry closet adjacent to the kitchen. The Johnson court held that the danger presented by a gunman who amply demonstrated his propensity to use his weapon constituted an exigent circumstance that justified the officers' warrantless entry into the house and the seizure of the shotgun. Id.
 {¶ 42} However, the Sixth Circuit Court of Appeals has expressly declined to find exigent circumstances where the police had reason to believe that a gun they were searching for was placed in a home, but where none of the risk of danger elements found in Johnson, supra, were present. United States v. Keys
(Aug. 9, 2005), C.A. 6 (Tenn.) No. 03-6041, 2005 Fed. App. 0678N, unreported. In Keys, a witness observed a woman retrieve the gun from the ground, at the point where a suspect fled from a police officer on foot, and retreat into a home the suspect had attempted to enter. The court found that the mere fact that the police were "nervous about where that gun would end up," did not constitute a risk of danger exigency sufficient to overcome the homeowner's Fourth Amendment rights. Id.
 {¶ 43} Here, while the trial court concluded that entry into the gun safe was necessary to protect the lives of law enforcement officers and other innocent persons, we note that Deputy Malone's entry into the safe could afford no such protection. If the weapon was present in the safe, as Mr. Simmons believed, it was secured in the custody of its owner and presented no immediate risk of harm to anyone. Similarly, discovery that the weapon was missing from the safe would do nothing to secure the safety of law enforcement officers or the public because the whereabouts of the gun would still be unknown. The Deputies and Det. Croy sought to search the gun safe merely to confirm or negate the existence of one possible risk to the public and/or law enforcement officer.
 {¶ 44} We question the immediacy of the need for such knowledge, particularly in light of the fact that, even if the gun was accounted for, the law enforcement officers should have been prepared to deal with the very real possibility that the fleeing burglary accomplice might possess his own weapon. The knowledge that the missing gun was locked safely away might allow law enforcement to better allocate its resources by calling off the search of the field between the Simmons house and the church. However, we cannot say that the need for such information was so urgent that it outweighed Mr. Simmons' Fourth Amendment right to be free from an unreasonable and unwarranted search of his own home.
 {¶ 45} The Deputies could have achieved the same result by first asking Mr. Simmons to unlock the safe, himself, once the key was located. Then, if he refused, they could have easily secured the house while they sought a proper search warrant. In fact, the record reflects that once they discovered the marijuana in the gun safe, they secured the house while they went to apply for just such a warrant. Although, instead of obtaining a warrant they obtained the written consent of both Mr. and Mrs. Simmons to conduct a further search of the home.
 {¶ 46} Based upon the foregoing, we conclude that a prudent and reasonable officer would not have concluded that a warrantless search was necessary to protect the lives of law enforcement officers and other innocent persons. Accordingly, we sustain Mr. Simmons' second assignment of error.
 {¶ 47} We note that Mr. Simmons does not specifically assign error to the trial court's finding that the marijuana in the gun safe fell within the "plain view" exception to theFourth Amendment warrant requirement. However, our resolution of Mr. Simmons' first two assignments of error necessarily undercuts the trial court's determination that Deputy Malone lawfully seized the marijuana because he found it in plain view.
 {¶ 48} Under the plain view doctrine, a law enforcement officer may lawfully seize an object in plain view without a warrant if: (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the item is in plain view; and (3) the incriminating character of the item is "immediately apparent." Horton v.California (1990), 496 U.S. 128, 136-137.
 {¶ 49} Here, the trial court erroneously found that Deputy Malone did not violate the Fourth Amendment in arriving at the open safe, where the evidence could be plainly viewed on the bases that: (1) the opening of the safe did not constitute a search within the meaning of the Fourth Amendment because, under the circumstances, Mr. Simmons had no reasonable expectation of privacy in his own home; (2) Mr. and Mrs. Simmons voluntarily consented to the presence of law enforcement officers in their home; and (3) exigent circumstances obligated the Deputies to find the gun to protect or preserve life and avoid serious injury. However, we have already found that none of the reasons cited by the trial court justified Deputy Malone's opening and search of the locked gun safe without a warrant under the facts presented here. Because Deputy Malone violated Mr. Simmons'Fourth Amendment rights in arriving at the place from which he could plainly view the marijuana, the trial court's finding that the seizure of the contraband was justified because it was found in plain view must fail.
 IV. {¶ 50} In his third assignment of error, Mr. Simmons contends that the trial court erred in finding that he and his wife freely and voluntarily gave their consent to search their home after Deputy Malone opened the locked gun safe. Specifically, Mr. Simmons contends that because the initial search of the gun safe was illegal, the state had to prove an unequivocal break in the chain of illegality to in order to demonstrate that the subsequently obtained consent was valid. Additionally, Mr. Simmons contends that the consent to search he and his wife executed, after being transported to the Highland County Justice Center, was obtained as a result of threats and coercion.
 {¶ 51} It has long been held that the exclusionary rule applies not only to evidence directly obtained during an illegal search or seizure, but also to derivative evidence, or fruit of the poisonous tree, obtained as a direct result of the illegal search or seizure. See, e.g., Silverthorne Lumber Co. v.United States (1920), 251 U.S. 385. As we stated above, consent to a search ordinarily constitutes an established and well-delineated exception to the Fourth Amendment's warrant requirement. However, we have previously recognized that when consent is "`obtained during a period of illegal detention,' the consent is negated `even though voluntarily given if [the consent is] the product of the illegal detention and not the result of an independent act of free will." State v. Bennett (June 21, 2000), Ross App. No. 99CA2509, citing Florida v. Royer (1983), 460 U.S. 491, 501;Robinette, 80 Ohio St.3d 234, at paragraph three of the syllabus; State v. Lovensheimer (Dec. 23, 1998) Ross App. No. 98 CA 2420. See, also, State v. Retherford (1994),93 Ohio App.3d 586, 602. In order for consent to be considered an act of free will, "the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave."[2] Id., citing Robinette,80 Ohio St.3d 234, at paragraph three of the syllabus.
 {¶ 52} Here, the trial court erroneously found that the Deputy's search of the locked gun safe did not violate Mr. Simmons' Fourth Amendment rights. Therefore, in determining that Mr. Simmons' subsequent consent was voluntary, the court did not consider the impact of the illegal search, or Mr. Simmons' subsequent detention, upon that consent. Because the trial court did not consider this question below, it would be improper for this reviewing court to usurp the trial court's role by proceeding on the merits of this question. See, e.g., Murphy v.Reynoldsburg (1992), 65 Ohio St.3d 356, 360; State v. Cookson
(Sept. 25, 2001), Washington App. No. 00CA53, 2001-Ohio-2587. Accordingly, we overrule Mr. Simmons' third assignment of error and remand this cause for further proceedings consistent with this decision.
 V. {¶ 53} In conclusion, we sustain Mr. Simmons' first and second assignments of error and overrule his third assignment of error. Accordingly, we affirm the trial court's judgment in part, reverse it in part, and remand this cause for further proceedings consistent with this decision.
Affirmed in Part, Reversed in Part, and Cause Remanded.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED IN PART, AND REVERSED IN PART, and the cause remanded for the trial court for further proceedings consistent with this decision, and Appellant and Appellee to split costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. The stay as herein continued will terminate in any event at the expiration of the sixty day period.
The stay shall terminate earlier if the appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec.2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of said sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, P.J.: Concurs in Judgment Only.
McFarland, J.: Concurs in Judgment and Opinion as to Assignment of Error I; Dissents as to Assignments of Error II and III.
[1] Although we note, again, that there is no evidence in the record to support the trial court's finding that the Deputies brought the recovered guns into the Simmons residence.
[2] In contrast, in the absence of an illegal detention, the state need only demonstrate that the totality of the circumstances establishes that the individual voluntarily consented to the search. Bennett, supra, citing Schneckloth,
and LaFave, Search and Seizure (3 Ed. 1996) Section 8.2(d).