[Cite as *State v. Lunder*, 2017-Ohio-84.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103653**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JOSEPH LUNDER

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-591532-B

**BEFORE:** McCormack, J., Jones, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** January 12, 2017

**ATTORNEYS FOR APPELLANT**

Donald J. Malarcik
Seneca Konturas
The Gothic Building
54 E. Mill Street, Ste. 400
Akron, OH 44308


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: John Farley Hirschauer
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

{¶1}   Appellant Joseph Lunder appeals from a judgment of the Cuyahoga County Court of Common Pleas that convicted him of multiple drug offenses.   Lunder's convictions stemmed from a 911 call made by Pastor Jerome Golden on a Sunday morning.   Golden called 911 to report that the door to a warehouse building across the street from his church was wide open and he felt something was wrong.   Maple Heights police officers quickly responded to the report of a suspected burglary.   The officers entered the building without a warrant through the wide open door.   Instead of finding suspects or victims, the officers stumbled on a substantial marijuana growth operation.

{¶2} The main issue in this appeal is whether the Maple Heights police search of the warehouse building  without first obtaining a warrant violated the Fourth Amendment protections against unreasonable search and seizure.

{¶3}   At the outset, we recognize that vigorous nurturing of the protections contained in the Constitution's Fourth Amendment is essential to the American way of life.   With that orientation, we carefully and thoroughly considered this case.   We conclude the search conducted by the police without a warrant was not an unreasonable one; it was, in fact, beyond just reasonable. It was solid, legal police work.   As we also conclude appellant's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence, we affirm the trial court's judgment.

**Substantive Facts and Procedural History**

{¶4}   Around 11:00 a.m. on Easter Sunday, April 22, 2014, Maple Heights police officers responded to a 911 call from Jerome Golden, a pastor at Golden Outreach Deliverance Center on Broadway Avenue, Maple Heights.   He called to report a possible break-in of a warehouse building across the street from his church.   The police quickly responded.

{¶5}   When Officer Charles Lee and Corporal Williams Kevern arrived, the door to the building was wide open, confirming the 911 call, and there was spilled dirt on the floor of the entrance.   Because of the size of the building, the officers waited for additional officers to arrive before entering.   The officers announced their presence and then entered the building to look for suspects or victims.   They did not find anyone inside the building, but observed, in plain view, items consistent with a marijuana growing operation, including freshly cut marijuana plants, hazmat suits, fans, fluorescent lights, oxygen masks, and soil.

{¶6}   Once the building was cleared for any suspects or victims, the officers exited. Detective Allen Henderson arrived to further investigate the building.   Due to the presence of a large amount of mold, Henderson called the fire department first for a hazardous response team to examine the mold and other chemicals present.   Henderson then telephoned the county prosecutor's office seeking advice as to whether a search warrant was necessary to take further actions regarding the evidence.   Henderson was advised that a warrant would not be necessary under the circumstances in that the plants

were in plain view. Henderson then arranged for Detective Griffs from Southeast Area Law Enforcement ("SEAL") Narcotics Task Force to collect the evidence found throughout the warehouse.

{¶7} The warehouse is a two-story building that formerly housed a wedding accessories business, as indicated by an old sign above the building. It had a large sign in the front window stating "Building for Rent," which listed a telephone number to call. The officers entered the building without first calling the rental phone number.

{¶8} While Detective Henderson searched the building, Maple Heights police attempted to reach the owner of the building by searching the police database for local businesses. They reached Jerry Skuhrovec. Apparently he and his ex-wife Nancy Calafato jointly owned the building before their divorce but Nancy was now the sole owner of the building after their divorce. Jerry Skuhrovec arrived at the scene but not before the police already entered the building to investigate the report of the suspected break-in. Jerry's brother Joseph Skuhrovec, Sr., who had the keys to the building, arrived at the scene later. When Joseph Sr. went to his truck to retrieve the keys, Detective Henderson saw in Joseph Sr.'s truck latex gloves and Tyvek suits that matched those found in the building. The police arrested Joseph Sr.

{¶9} The police suspected Joseph Lunder, who was married to Joseph Sr.'s daughter Ashley Skuhrovec, was also involved in the marijuana growing operation. Items with Joseph Lunder's name on them were found inside the building: his 2011 tax returns; a prescription bottle with his name on it; a Home Depot receipt for a

five-gallon bucket purchased with Lunder's military discount; a box for an industrial-sized 23000 BTU air conditioning unit with Lunder's former address in Akron; and a business card with Lunder's username "JLunder77" on it. The DNA from the cuffs of the Tyvek suits matched Lunder's DNA profile.

{¶10} Based on the items found in the warehouse, Detective Griffis obtained a search warrant for Lunder's residence, where he lived with his wife Ashley Skuhrovec and her brother Joseph Skuhrovec, Jr. In a truck parked in the driveway of the residence, Detective Griffis found Winter Green Kodiak chewing tobacco, which was also found in the trash at the warehouse building and inside a coat found there that contained Lunder's prescription, and Rock Star energy drink, also found in the building. In the garage, Detective Griffis found a bucket lid matching a bucket from the warehouse building, as well as latex gloves, gardening shears, timing devices, and ceramic heaters identical to those found in the building. Detective Griffis also found an iPad in Lunder's bedroom with the browser opened to websites with advice and instructions for growing marijuana. Also found were Polaroid pictures of Lunder standing next to large marijuana plants.

{¶11} Lunder and Joseph Skuhrovec, Sr., were indicted for three counts of drug offenses: illegal manufacture of drugs or cultivation of marijuana (in an amount more than five thousand and less than twenty thousand grams), trafficking in marijuana (in an amount more than five thousand grams and less than twenty thousand grams), and

possession of marijuana (in an amount more than five thousand and less than twenty thousand grams). In addition, they were indicted for possession of criminal tools.

**{¶12}** Joseph Skuhrovec, Sr., filed a motion to suppress, and Lunder joined on that motion. Skuhrovec, however, subsequently pleaded guilty to illegal manufacture of drugs or cultivation of marijuana, a felony of the third degree.

**{¶13}** Lunder pleaded not guilty. The trial court held a hearing on his motion to suppress and denied the motion. The matter proceeded to a jury trial, and Lunder was found guilty on all counts. The trial court merged the marijuana trafficking and marijuana possession counts into the manufacturing/cultivation count. For his convictions, the court sentenced him to 40 months of community control with electronic-home monitoring for 100 days and 300 hours of community service. The court also imposed the forfeiture specifications, retaining his seized property. In addition, Lunder received a fine of $5,000.

**{¶14}** On appeal, Lunder raises the following assignments of error:

1. The trial court erred when it failed to grant defendant/appellant's motion to suppress evidence seized by police without a warrant in violation of defendant/appellant's Fourth Amendment Rights against unreasonable search and seizure.

2. The trial court erred in failing to grant the defendant's Ohio Crim.R. 29 Motions for Acquittal.

3. The trial court erred in entering judgment on the verdict because it was not supported by sufficient evidence.

4. The trial court erred in entering judgment on the verdict that was against the manifest weight of the evidence.

**Warrantless Search**

{¶15} Under the first assignment of error, Lunder claims the evidence for his convictions was seized by the police without a warrant, in violation of his Fourth Amendment right against unreasonable search and seizure.

{¶16} An appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 22 (8th Dist.). Once we accept the factual findings as true, however, "'we must independently determine, as a matter of law and without deference to the trial court's conclusion, whether the trial court met the applicable legal standard.'" *Id.*, quoting *State v. Lloyd*, 126 Ohio App.3d 95, 709 N.E.2d 913 (7th Dist.1998).

{¶17} We recognize that, subject to certain exceptions, warrantless searches and seizures are per se unreasonable pursuant to the Fourteenth Amendment of the United States Constitution and Article I, Section 14 of the Ohio Constitution. Under the full circumstances of this case, the procedures followed and resultant conduct of the Maple Heights police officers is lawful pursuant to the well-established "community-caretaking exception" to the search warrant requirement, also referred to as the "emergency-aid exception" or "exigent-circumstance exception." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 15.

{¶18} The courts have always recognized that police officers have roles other than investigating criminal conduct and developing and maintaining evidence of crime. Police officers are also charged with the duty to "prevent crime, preserve the peace, and protect persons and property." *State v. Russell*, 127 Ohio App.3d 414, 417, 713 N.E.2d 56 (9th Dist.1998). Under this exception, Ohio courts have recognized that a police officer may lawfully enter a structure to protect the property of the owner or occupant when the police reasonably believe that the premises have been or are being burglarized. *State v. Sladeck*, 132 Ohio App.3d 86, 89, 724 N.E.2d 488 (1st Dist.1998).

{¶19} Therefore, the case before us turns on whether the officers on that Sunday morning reasonably believed the building had been breached, requiring an immediate action to safeguard either life, property, or both.

{¶20} "[I]n determining whether the totality of the facts and circumstances known to an officer give rise to a reasonable belief that immediate entry is necessary," we apply an objective standard. *State v. Simmons*, 4th Dist. Highland No. 05CA4, 2006-Ohio-953, ¶ 39. The question is whether a prudent and reasonable officer would see a need to act immediately. *Wayne v. United States,* 318 F.2d 205 (D.C.Cir.1963). "Reasonable belief is assessed from the facts and circumstances known to the officers, and from their point of view." *Lakewood v. Simpson*, 8th Dist. Cuyahoga No. 80383, 2002-Ohio-4086, ¶ 14.

{¶21} At the suppression hearing, Pastor Golden testified that he was at his church, located across the street from the warehouse building, every Sunday morning. On most

Sunday mornings, there would be a van parked in front of the building. On that Sunday morning, the front door of the building was "wide open" but there was no van in sight and no one was around. Based on his familiarity with the building on Sunday mornings, he felt "something was wrong." He called 911 to inform the police that the front entrance of the building across the street from his church was wide open, which was unusual.

{¶22} Officer Charles Lee and Corporal William Kevern responded to the dispatch call for an open building, later joined by Detective Allen Henderson. All three testified at the hearing. Officer Lee testified that there were burglaries and robberies in that Maple Heights neighborhood and, prior to the incident, he had personally responded to break-ins and burglaries in the area. Detective Allen Henderson testified at the hearing that there were 34 burglaries within a year within five-square miles of the building.

{¶23} When Officer Lee arrived at the scene with his supervisor Corporal Kevern, what they observed confirmed the 911 call: the front entrance to the building was wide open and no one appeared to be around. On a Sunday morning, this raised suspicions. Indeed, Officer Lee and Corporal Kevern requested additional backup officers before entering the building — the fear of the possibility of interrupting nefarious criminal activity in progress was real.

{¶24} To assess whether the officers' action was reasonable, we bear in mind that the nature of the duty of policemen and firemen at times requires them "'to act, not to speculate or meditate on whether the report is correct.'" *State v. Johnson*, 8th Dist.

Cuyahoga No. 96983, 2012-Ohio-1344, ¶ 11, quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963). We must also judge the reasonableness of the officer's belief from the perspective of the officers on the scene, rather than with the 20/20 vision of hindsight.

{¶25} How reasonable then was the officers' action? Was there any aspect of the entry and search of the property that had a disingenuous, unsupportable, unsavory, alternative purpose to it? Was the police department operating in genuine good faith in responding to the 911 call, or was their action merely a pretext to improperly gather evidence of criminal misconduct that they suspected or knew was taking place? Should the officers have first called the phone number of the sales or rental agents of the building listed on the window sign before going in? Were the officers cutting corners, hasty, negligent, careless, or heavy handed? Did the totality of the circumstances that morning require a court-ordered search warrant prior to their entering the building?

{¶26} Given the totality of the facts and circumstances known to the Maple Heights police officers on that Sunday morning, the officers reasonably interpreted the 911 call as reporting a possible break-in in progress. They understandably decided that time was of the essence. They were duty bound to move immediately to prevent the possible endangering of human life or destruction of real or personal property inside an apparently breached building. Until they went in, until they saw room to room for themselves, they could not know for certain the degree of threat that existed. This was

diligent and prudent police work. This safety forces work does not constitute an unreasonable search and seizure.

{¶27} It is worth noting the measured Fourth-Amendment-based progression of action that is evident through the officers' response and investigation. The responding officers took steps to abide by the mandate of the reasonable search and seizure requirement of the Fourth Amendment when it became clear that they had entered into not just a possible breaking and entering, but an industrial-sized marijuana production operation. First, they stopped to obtain an opinion from the county prosecutor's office as to the necessity of a search warrant and were advised that immediate circumstances and bulk evidence in plain view did not require a warrant. Further, when a target of their investigation was identified as Mr. Lunder, a search warrant was sought and obtained before an attempt to search his home. The police department well understood the nuances — there was a time to move as contrasted with the time to pause. So did the trial court. The court properly denied the motion to suppress.

{¶28} When Pastor Golden placed the 911 call on that Sunday morning, he was reaching out to a community lifeline, his local police department. His instinct and judgment was that something was out of place, something was wrong across the street, it was something unusual, and it needed to be addressed then and there. He was not calling to report uncollected trash or a pothole but to report that a neighboring property may have been unlawfully breached by unauthorized persons. The Maple Heights Police Department responded to an at-risk area accordingly. Viewed in its totality, the police

conduct in this case constituted constitutionally sustained, exemplary community policing.

{¶29} The first assignment of error lacks merit.

**Sufficiency and Manifest Weight of the Evidence**

{¶30} Under the second, third, and fourth assignments, Lunder claims his convictions were not supported by sufficient evidence and they were against the manifest weight of the evidence. We address these assigned errors together.

{¶31} When considering a challenge of the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶32} Lunder argues that the state did not present sufficient evidence to prove possession, an essential element of the drug offenses he was charged with.

{¶33} Pursuant to R.C. 2925.01(K), "possession" means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or

substance through ownership or occupation of the premises upon which the thing or substance is found."

**{¶34}** Possession of a controlled substance may be actual or constructive. *State v. Mann*, 93 Ohio App.3d 301, 308, 638 N.E.2d 585 (8th Dist.1993). "Actual possession requires ownership and, or, physical control." *State v. Messer*, 107 Ohio App.3d 51, 56, 667 N.E.2d 1022 (9th Dist.1995). Constructive possession, on the other hand, exists when a person "knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus. Dominion and control may be proved by circumstantial evidence alone. *State v. Trembly*, 137 Ohio App.3d 134, 141, 738 N.E.2d 93 (8th Dist.2000).

**{¶35}** Here, the state presented substantial circumstantial evidence showing not only Lunder's presence in the warehouse but also his direct involvement in the marijuana growing operation. Nancy Calafato testified that Lunder leased the building from her and paid her monthly rent and utilities in cash, which Joseph Sr. would bring her every month. On one occasion, Lunder thanked Calafato for letting him use the building. Lunder's business card, tax returns, Home Depot receipt for a five-gallon bucket, medication prescription, his chewing tobacco and energy drinks, as well as gardening shears were found in the warehouse. A box for an industrial-sized 23,000 BTU air conditioning unit in the building was addressed to "Joseph Lunder" at his former Akron residence. His DNA was consistent with the DNA from the cuffs of the Tyvek suits

found in the building. Websites with instructions on marijuana growing were opened in an iPad found in his bedroom. Several Polaroid pictures showed Lunder standing next to large marijuana plants.

{¶36} Thus, the state produced overwhelming circumstantial evidence to prove Lunder's possession of the illegal substance at issue, both actual and constructive. Lunder's sufficiency-of-evidence claim regarding his offense of possession of criminal tools likewise fails.

{¶37} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest-weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. Unlike challenges to the sufficiency of the evidence, which raise a question of law, manifest weight challenges raise factual issues. When a defendant asserts that his conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id*. at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶38} Mindful that the weight to be given the evidence presented by the state and the credibility of the witnesses are primarily for the trier of the facts, *State v. DeHass*,

10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus, we cannot conclude the jury in this case lost its way and created such a manifest miscarriage of justice that Lunder's convictions must be reversed and a new trial ordered. The second, third, and fourth assignments of error are without merit.

{¶39} Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

LARRY A. JONES, SR., P.J., CONCURS;
PATRICIA ANN BLACKMON, J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

PATRICIA ANN BLACKMON, J., DISSENTING:

{¶40} I respectfully dissent from the majority opinion because I believe that the trial court should have granted the defendant's motion to suppress.

{¶41} Based on the facts presented at the suppression hearing, the police did not have a reasonable belief that immediate action was necessary to enter the building without

a warrant.    The majority is of the belief that when a neighbor calls 911 to report what "they" perceive to be an unusual situation, the police have a right to disregard the Fourth Amendment and investigate even when    there are no signs of immediate danger.

{¶42} At the hearing, Pastor Golden, the neighbor, testified that ordinarily on Sundays, he saw a white Econo-line van parked in front of the building and saw individuals moving tools in and out of the building.   On this Sunday, the door was open, but no van was in sight.   The majority believes this was cause for immediate alarm and entry into the building.

{¶43} Interestingly, the officers did not enter immediately; they took the time to wait for back-up, but failed to further question the pastor or call the telephone number prominently displayed on the front window to further determine whether immediate entry was necessary.   Without more evidence of a break-in, I believe that the entrance without a warrant violated the Fourth Amendment.   In fact, if speculation is the basis for entry, it could just as easily been speculated that someone left the door open while in the process of moving in or out of the premises.   In fact, the dispatch reported the incident as an "open door" not a burglary.   A door simply open with no sign of forced entry is not enough to allow for a warrantless search.

{¶44} The police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.  *State v. Sheppard*, 144 Ohio App.3d 135, 140-141, 759 N.E.2d 823 (1st Dist.2001), citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)._   As such, the decision to

enter must be based on more than a hunch. *United States v. Radka*, 904 F.2d 357, 362 (6th Cir.1990). The key issue is whether the officers had reasonable grounds to believe that some kind of emergency existed, and "the officer must be able to point to specific and articulable facts, which, taken with rational inferences from those facts, reasonably warrant intrusion into protected areas." *State v. White*, 175 Ohio App.3d 302, 2008-Ohio-657, 886 N.E.2d 904, ¶ 17 (9th Dist.). The fact that the pastor stated that the front door was "wide open" and that this was "unusual" was not enough alone to support reasonable grounds that an emergency existed.

{¶45} The state cited to several cases where courts have held that the exigent circumstance exception applied when the home is being burglarized or has been burglarized. However, in those cases, there was definitive evidence of a forced entry. *See State v. Sladeck*, 132 Ohio App.3d 86, 724 N.E.2d 488 (1st Dist.1998) (police entered home after call from a neighbor who saw two juveniles kick in the window but was unsure whether the suspects were still inside); *State v. Overholser*, 2d Dist. Clark No. 96-CA-0073, 1997 Ohio App. LEXIS 3571 (July 25, 1997) (police entered home after call from alarm company that alarm had alerted); *State v. Canty*, 9th Dist. Lorain No. 90CA004775, 1990 Ohio App. LEXIS 3604 (Aug. 22, 1990) (police entered home after call from neighbor who saw broken basement window, back gate open, and no response at door); *State v. Durbin*, 12th Dist. Butler No. CA87-12-167, 1988 Ohio App. LEXIS 2746 (July 11, 1988) (police entered home after anonymous call that someone with flashlight was behind a house where no one was home; police saw back door to basement

ajar and doorknob on ground); *United States v. Estes*, 479 F.2d 1273 (6th Cir.1973) (police responded to radio dispatch of breaking and entering and entered after finding apartment door wide open with pry marks.)

**{¶46}** Here, unlike the cases above, the circumstances confronting the police were relatively benign: a vacant building with an open door at 11:00 a.m. This was not an emergency situation in which the police could not wait for a warrant to be obtained. There was no indication how long the door had been open. There was no sign of forced entry, no pry marks on the front door, and no broken windows. No one reported a suspicious person in the area of the building. No alarm had been triggered. There was no evidence that there was an immediate threat to person or property.

**{¶47}** In fact, Officer Lee first testified that he was concerned that someone was "habitating" in the building. This would not create an urgent matter requiring an intrusion without a warrant. On redirect, Officer Lee admitted that he did not know whether someone was in need of assistance or whether the building was being burglarized. These facts are different from the cases cited by the state where there were positive indications that the property was in fact being burglarized, i.e., broken window, alarm triggered, suspicious person seen, door pried open, person observed kicking a window open. In the instant case, the officers' intrusion was based solely on a "hunch" that something was amiss.

**{¶48}** This case was more akin to the decision of this court in *State v. Robinson*, 8th Dist. Cuyahoga No. 83508, 2004-Ohio-4483. In *Robinson*, we held that the exigent

circumstance exception to a warrantless search did not apply. In that case, a neighbor informed the officer he had observed cars coming and going at all hours of the night from a supposedly vacant house. The responding officer observed the house with the lights on and tracks showing recent vehicular traffic. There were no noises coming from the house, which appeared to be empty. The officer suspected teenagers were partying in what he believed was a vacant house and entered the unlocked door where he found 290 pounds of marijuana. We reversed the trial court's denial of the defendant's motion to suppress, concluding that the fact that the door was unlocked and the officer believed that teenagers were partying in what he believed to be a vacant house did not present an emergency situation that would allow the police to enter without first obtaining a warrant.

{¶49} The Ninth District decision in *State v. Hendrix*, 9th Dist. Summit No. 27217, 2014-Ohio-3577, is even more similar to the facts in our case. In Hendrix, a neighbor called police at 10:30 a.m. to report that his neighbor's garage door was open and that no one had been seen at the house. He told the police that this was unusual. The responding officer testified that based on the call, he was concerned that the person living in the house was in need of assistance or that there had been a burglary. When the officers arrived on the scene, the garage was open and no cars were in the garage. There was no evidence of a break-in. The mail carrier told the officers that the mail had not been picked up from the prior day, but that this was not unusual. The officers entered the home through an unlocked door in the garage and found that the bathroom was being used to grow marijuana.

**{¶50}** The *Hendrix* court held that the circumstance did not, when viewed objectively, lead one to believe that anyone in the house was in need of immediate assistance. The court found that the police could not confirm how long the door was open or whether the resident had been absent for a significant length of time. There was no sign of a break-in, and the mail carrier confirmed that the fact that the mail was not retrieved was not out of character. The court concluded:

> We share the officers' concern for the safety of area citizens, but those concerns must rise to the level of a reasonable belief that someone in the residence is in need of immediate aid, *see [State v.] Nields,* [93 Ohio St.3d 6, 15, 752 N.E.2d 859 (2001)], in order to justify a warrantless intrusion into a private residence. Given the record before us, we cannot say that the trial court erred in concluding that the emergency aid exception did not apply in light of the circumstances present. This is not to say that calls by concerned neighbors accompanied by the appropriate circumstances at the scene can never satisfy the emergency aid exception; we only decide that the trial court did not err in finding that the emergency aid exception did not apply to the situation faced by Officers Hall and Semonin. In other words, when objectively viewed, the exigencies of the situation were not so compelling as to render a warrantless entry and search reasonable under the circumstances. *See Mincey*, 437 U.S. at 394. Instead, their entry was based on the mere possibility that there might be someone inside who might be in need of assistance. Such is insufficient to warrant entry under the emergency aid exception.

*Id*. at ¶ 13.

**{¶51}** In conclusion, I believe that when objectively viewed, the simple fact that the door to the business was open was not so compelling as to render the warrantless entry and search reasonable under these circumstances. The community-caretaker doctrine cited to by the majority simply is not applicable here. There was absolutely no evidence that a person was in harms way or that property was at risk. I simply cannot

accept that an open door of a commercial building on a Sunday morning is, in and of itself, an occurrence that reasonably and objectively creates the impression of an immediate threat to person or property   to justify a warrantless search of the premises. Whatever suspicion or concern the open door aroused in the officers falls far short of that needed to justify the warrantless entry into the building.   To hold otherwise requires an adopting of a security check exception to the warrant requirement or stretch of the emergency exception far beyond its intended and logical reach.   In my judgment, the Fourth Amendment rights of all citizens outweigh the expectations of some business owners that law enforcement authorities will enter and secure commercial premises found open during the day.    The officers needed a warrant, and the matter should have been presented to a neutral, detached magistrate.   They surely had plenty of time to get one, and the Fourth Amendment requires one when faced with these facts.

{¶52} I would reverse the trial court's decision denying the motion to suppress and vacate Lunder's convictions.